1

2

3

4

5

6

7

8

9                        UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   MARICELA LAURINO, et al.,                    No.  1:18-cv-00636-NONE-SAB

13              Plaintiffs,

14        v.                                      ORDER DENYING MOTION FOR
                                                  ADVERSE INFERENCE WITHOUT
15   UNITED STATES OF AMERICA,                    PREJUDICE AND DENYING MOTION FOR
                                                  TERMINATING SANCTIONS
16              Defendant.
                                                  (Doc. Nos. 54, 55, 58)
17

18

19                                **BACKGROUND**

20        The central dispute in the case is whether the United States ("defendant") is liable for the

21   wrongful death of Manuel Jurado ("Jurado"), who was riding his motorcycle when he was

22   involved in an accident with a US Postal Service vehicle.  (*See generally* Doc. No. 1.)  Jurado

23   died as a result of the accident.  (*Id*. ¶ 2.)  Jurado had two sets of children from his first and

24   second wives (the "Laurino Plaintiffs" and the "Jurado Plaintiffs," respectively).  Both sets of

25   children are plaintiffs in this consolidated wrongful death action.  (*See* Doc. No. 54 at 2.)

26        The extended family also was involved in a probate dispute after Jurado's death.  (*See*

27   Scarborough Decl. (Doc. No. 54) Ex. 8 (docket sheet reflecting January 14, 2019 Petition for

28   Revocation of Probate of Purported Will).)  In the context of that dispute, the Laurino Plaintiffs

                                        1

1    submitted a handwritten document dated May 21, 2016, asserting that the document was the

2    decedent's will.  (*See id*. Ex. 1 (Marisela Laurino Dep.) at 60; *id*. Ex. 5 (order and related

3    documents from probate court).)  The May 21, 2016 document paints (in detail) decedent's

4    relationship with the Jurado Plaintiffs in a negative light and his relationship with the Laurino

5    Plaintiffs in a positive light.  (*Id*. Ex. 6.)  The Jurado Plaintiffs challenged the validity of this

6    document in probate court and the parties eventually settled the matter.  (*See generally id*. Ex. 8.)

7         The May 21, 2016 document was produced in discovery in this case.  Initially, the Laurino

8    Plaintiffs all testified at deposition that the document was signed by their father.  (*Id*. Ex. 1

9    (Marisela Dep.) at 62; *id*. Ex. 2 (Vivian Dep.) at 40; *id*. Ex. 3 (Irma Dep.) at 55–56; *id*. Ex. 4

10   (Yvette Dep.) 57, 60.)  Several Jurado Plaintiffs disagreed and testified that the document was not

11   in their father's handwriting.  (*Id*. Ex. 10 (Patricia Dep.) at 53–54, 55; *id*. Ex. 11 (Joel Dep.) at

12   46–47.)

13        Once questions about the May 21, 2016 document arose, the United States followed up

14   with additional discovery requests aimed at the Laurino Plaintiffs (*id*. ¶ 14 & Ex. 13), who

15   objected and invoked the Fifth Amendment (*id*. Exs. 14–17).  Two motions to compel followed.

16   (Doc. Nos. 29, 32.)  One was withdrawn, but another was ruled upon by the assigned magistrate

17   judge, who required the Laurino Plaintiffs to produce handwriting exemplars.  (*See* Doc. No. 33.)

18        Defendant then hired a handwriting expert who concluded that it was more probable than

19   not that the handwriting on the May 21, 2016 document was not Jurado's and that there were

20   reasons to believe the signature on the document was not his either.  (Scarborough Decl. Ex. 13.)

21        Thereafter, defendant filed the motion now pending before the undersigned, which

22   requests: (1) adverse inference determinations that the May 21, 2016 document discussed above

23   was not written by decedent and that the Laurino Plaintiffs falsely testified concerning the

24   handwriting in this document; (2) terminating sanctions against the Laurino Plaintiffs.  (Doc. No.

25   54.)

26   /////

27   /////

28   /////

1 **ANALYSIS**

2 **A.      Request for Adverse Inference Determinations**

3        As mentioned, defendant is asking the court to make adverse inference determinations

4 that:  (a) the May 21, 2016 document was not written by decedent and (b) that the Laurino

5 Plaintiffs falsely testified concerning the handwriting.  Here, if found appropriate, such an

6 inference would be made in the face of the Laurino Plaintiffs' invocation of their Fifth

7 Amendment privilege against self-incrimination.  The Ninth Circuit provides that "no negative

8 inference can be drawn against a civil litigant's assertion of his privilege against self-

9 incrimination unless there is a substantial need for the information and there is not another less

10 burdensome way of obtaining that information."  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d

11 1258, 1265 (9th Cir. 2000).  Further, the court must determine whether the value of presenting the

12 evidence is substantially outweighed by the danger of unfair prejudice to the party asserting the

13 privilege, and the inference may be drawn only when there is independent evidence of the fact

14 about which the party refuses to testify.  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911–

15 12 (9th Cir. 2008).  In sum, there must be:  (1) a substantial need; (2) no less burdensome way of

16 obtaining the information; (3) evidentiary value that substantially outweighs the danger of unfair

17 prejudice to the party asserting the Fifth Amendment; and (4) independent evidence of the fact

18 that the party refuses to testify about.

19        As an example, in *Nationwide*, in the context of a dispute over a life insurance policy, the

20 Ninth Circuit affirmed a district court's decision to draw an adverse inference from a wife's

21 refusal to testify about her own involvement in her husband's murder.  *Id*. at 912–13.  The Ninth

22 Circuit agreed that there was substantial need for the testimony because it "went to the central

23 question in the case":  whether she asked another person to murder her husband.  *Id*. at 912.

24 There was also ample independent evidence to support the adverse inference the district court

25 eventually drew (i.e., that the wife was involved in the murder), including evidence that the wife

26 was having an affair with the murderer.  *Id*. at 912–13.

27        Here, the United States argues that the evidence the Laurino Plaintiffs are now

28 withholding (given their invocation of their rights under the Fifth Amendment) is important to the

3

1    government's defense case because that evidence is relevant on the issue of damages.  The United

2    States advances two alternative uses for the document to demonstrate that it has a "substantial

3    need" for the information.  On the one hand, the government contends that, assuming the May 21,

4    2016 document is a valid will, the will may be admissible because it speaks to Jurado's state of

5    mind concerning the relative closeness of his relationship with the two groups of Plaintiffs.  (*See*

6    Doc. No. 54-1 at 7.)  Among other things, the will presumably would then support a finding that

7    Jurado was not close with the Jurado Plaintiffs, which conflicts with what the Jurado Plaintiffs

8    contend in this action.  (*See id.*)

9         Alternatively, if the May 21, 2016 document was not written by Jurado, the United States

10   asserts that it could have used the evidence to demonstrate that one or more of the Laurino

11   Plaintiffs knowingly submitted an invalid document to the probate court to obtain Jurado's assets

12   after his death, and that all four Laurino Plaintiffs testified falsely about the document at

13   deposition in this case.  (*Id.* at 7–8.)  According to the United States, determining whether the will

14   is valid is the only way to resolve the conflicting evidence.  (*See id.*)

15        The United States' arguments roughly track the reasoning offered by the magistrate judge

16   in support of the finding that the United States required additional time to inquire into the validity

17   of the May 21, 2016 document because the document is "highly relevant to the Defendant's

18   ability to defend in this action, particularly as to amount of damages."  (Doc. No. 28 at 11.)  The

19   magistrate judge further found:

20   
21   
22   
23   
24   
25   
26   
27   

> The May 21 Letter contains statements that present the Decedent's relationship with the Jurado Plaintiffs in a negative light. The content of the letters, as well as the dispute over whether the Decedent wrote the letters, are relevant for various reasons. First, if the Laurino Plaintiffs' testimony that the letter was written by the Decedent is accurate, the sentiments contained in the letter directly relate to the Jurado Plaintiffs' claims and the amount of damages they would be entitled to recover in this wrongful death action. Second, given the Jurado Plaintiffs' testimony that the letters were not the Decedent's handwriting, if the letters were in fact written by the Decedent, such fact is relevant to impeach the Jurado Plaintiffs testimony that the Decedent did not write the letters. Third, if the Jurado Plaintiffs are correct that the handwriting does not belong to the Decedent, it is relevant to impeaching the Laurino Plaintiffs regarding the authenticity of the letters, and perhaps, may raise the possibility that the Laurino Plaintiffs committed perjury.

28

1    (*Id*. at 11–12.)

2         But that reasoning did not take into consideration, because it was not required to, whether

3    the information sought in discovery would ultimately be admissible at the trial of this action.  In

4    contrast, the adverse inference inquiry appears to require that the court consider admissibility.

5    The Ninth Circuit has described one of the steps in the adverse inference inquiry as follows:  the

6    court must examine whether the "value of presenting such evidence [i]s substantially outweighed

7    by the danger of unfair prejudice that drawing the adverse inference on that question would have"

8    on the party claiming the Fifth Amendment privilege.  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232

9    F.3d 1258, 1266 (9th Cir. 2000) (emphasis added).  In *Doe*, the Ninth Circuit specifically noted

10   that the adverse inference inquiry requires "a case-by-case analysis with a balancing test which

11   weighs the need for the information being sought (and consequently its admissibility at trial)

12   against the afforded constitutional protections."  *Id*. at 1267 (emphasis added).

13        It is important to focus carefully on how the government asserts that it would use the

14   evidence in question under the "will is valid" scenario.  Assuming that evidence the Laurino

15   Plaintiffs are withholding (due to their invocation of their rights under the Fifth Amendment)

16   could establish the validity of the May 21, 2016 document as a will, the government contends that

17   the document "would not be offered to prove the truth of the many factual matters asserted in it,

18   such as . . . whether the allegation of sexual abuse made in the will actually happened."  (Doc.

19   No. 58 at 4.)  Rather the government claims it would offer the evidence "to show Jurado's state of

20   mind concerning the relationship he had with the various plaintiffs."  (*Id*. at 5.)

21        Assuming this limited hypothetical proposed use, the Laurino Plaintiffs argue that the

22   evidence is irrelevant.  They claim that the decedent's state of mind is not relevant because what

23   really matters in the damages determination here is how the living children felt about their father,

24   not how he felt about them.  (Doc. No. 55 at 2–3.)  Although the Laurino Plaintiffs do not cite any

25   authority for this proposition, the very nature of a wrongful death suit suggests that the

26   government's planned use of the evidence would be of limited value in resolving any relevant

27   issue presented in this case.

28   /////

1    The United States cites the decision in *Krouse v. Graham*, 19 Cal. 3d 59, 68 (1977), for

2    the proposition that the will, if authentic, is relevant evidence of "the closeness of the family unit,

3    the warmth of feeling between family members, and the character of the deceased as kind and

4    attentive or kind and loving."  Other cases have built upon *Krouse* to confirm that evidence from

5    a wide circle of acquaintances may be relevant to proving the warmth of feeling between family

6    members and the character of the decedent.  *See Cederblom v. United States*, No. 05CV1551 J

7    (BLM), 2006 WL 8455438, at *3 (S.D. Cal. Mar. 14, 2006).  But none of these cases undermine

8    the central premise that wrongful death damages are designed to compensate the losses of the

9    living.  *See Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006) ("A plaintiff in a

10    wrongful death action is entitled to recover damages for his own pecuniary loss, which may

11    include (1) the loss of the decedent's financial support, services, training and advice, and (2) the

12    pecuniary value of the decedent's society and companionship—but he may not recover for such

13    things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions, or

14    for the sentimental value of the loss."); *see also* Cal. Code. Civ. P. § 377.61 (allowing a wrongful

15    death plaintiff to recover "damages . . . that, under all the circumstances of the case, may be just,

16    but may not include damages recoverable under [a survival action pursuant to] Section 377.34).

17    In light of the authorities cited above, any evidence of Jurado's state of mind would only

18    be admissible to the extent it supports (or undermines) the <u>claimed losses of the living, as</u>

19    <u>established by the Plaintiff groups</u>.  The only factual question under *Krouse* to which the will

20    would arguably be relevant is how close those family relationships <u>actually were</u>.  The United

21    States, however, cannot establish the answer to that question solely through Jurado's state of

22    mind, i.e. through admission of the will, because the terms of a will do not establish the losses of

23    the living in a wrongful death claim.[1]  Even assuming the May 21, 2016 document and any

24    testimonial evidence the Laurino Plaintiffs are withholding about that document were to be

25    /////

---

[1]  For instance, a will might disinherit a spouse or child—for whatever purpose or reason—who was nonetheless supported financially and emotionally during the decedent's life.  Such financial and emotional support during life could form the basis for damages in a wrongful death suit, notwithstanding the disinheritance by testamentary will.

6

1     admissible as proof related to the closeness of the family relationships,[2] the court is not persuaded

2     that the government has demonstrated either a substantial need for such evidence, or that there are

3     not less burdensome ways to prove the real nature of the various familial relationships at issue.

4     For one thing, third parties can be called testify as to the closeness of the family relationships at

5     issue.  On the present record, nothing suggests such an approach would prove insufficient to

6     establish (or challenge) plaintiffs' loss-of-society damages.[3]

7          For these reasons, the government's request for an adverse inference that the May 21,

8     2016 document was not authored by decedent will be denied without prejudice to a renewed

9     request at trial should further development of the record demonstrate that the relevant factors

10    warrant a different ruling.

11         On the flipside, assuming that the evidence the Laurino Plaintiffs are withholding (by

12    invocation of their Fifth Amendment privilege) could be used to establish that the May 21, 2016

13    document is not a valid will, such evidence would be inadmissible to establish Jurado's state of

14    mind because the letter was not authored by him.[4]  Under this "will is invalid" scenario, the

15    government still seeks an adverse inference determination that the Laurino Plaintiffs falsely

16

17    [2] Although there is no directly relevant hearsay exception, the United States claims that the
      documents would not be used for a hearsay purpose and therefore that the hearsay bar does not
18    apply at all.  (Doc. No. 58 at 4–5.)

19    [3] The court is also mindful that the very use suggested by the government under its "will is valid"
      scenario runs contrary to the adverse inference determination they request of the court, namely a
20    finding that the document was not written by decedent.  It appears that the government is simply
      posing this hypothetical use to underscore that the will is important to its case.  But it is not at all
21    clear that the adverse inference caselaw allows the court to bend reality in such a way when
      determining whether there is a "substantial need" for the information.  Crucially, an "adverse
22    inference can only be drawn when independent evidence exists of the fact to which the party
      refuses to answer." *Glanzer*, 232 F.3d at 1264.  The government cannot have its cake and eat it,
23    too in this regard.  In other words, it cannot force the court to assume the will is valid to establish
      substantial need, while at the same offering evidence it insists demonstrates that the will is not
24    valid.
25

26    [4] The United States points out, correctly, that the will could be subject to judicial notice because
      it was filed in probate court.  (Doc. No. 58 at 4 (*citing In re Tower Park Properties, LLC*, 803
27    F.3d 450, 452 n.2 (9th Cir. 2015)).)  But judicial notice would permit this court only to take
      notice that the will was filed in probate court and of the content of the document; judicial notice
28    would not automatically authenticate the will itself as a valid holographic will.

                                                       7

1    testified about the provenance of the will.  In relation to this request, the inference the

2    government asks the court to draw is not directly related to the will itself.  Rather, it is simply that

3    the Laurino Plaintiff's gave false testimony.  Such false testimony would have little to no direct

4    bearing on the loss-of-society damages case, but (obviously) might bear on the Laurino Plaintiff's

5    credibility should they elect to testify at the trial of this action.  Because it is not clear whether,

6    particularly in light of the controversy over the will,[5] any of the Laurino Plaintiffs intend to testify

7    at the trial in this case, the court declines to rule on this request at this time.  The United States

8    may renew its request in the form of a motion *in limine* as appropriate.

9    **B.      Request for Terminating Sanctions**

10         The United States has also requested imposition of terminating sanctions.  Courts have the

11   inherent power to dismiss an action where "a party has engaged deliberately in deceptive

12   practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Nat.*

13   *Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995).  Dismissal may be an appropriate

14   sanction for falsifying a deposition, under Federal Rule of Civil Procedure 11, as a well as under

15   the court's inherent powers. *Combs v. Rockwell Int'l Corp*., 927 F.2d 486, 488–89 (9th Cir.

16   1991) ("Counsel's changes [to the deposition] dealt with issues of central importance in the

17   upcoming summary judgment hearing . . . The mendacity of the client and the combined fraud

18   and incompetence of his counsel are so egregious that there is no need to reach the merits of the

19   motion for summary judgment.  The case was properly dismissed.").  "Before imposing the harsh

20   sanction of dismissal, the district court must weigh several factors:  (1) the public's interest in

21   expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of

22   prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on

23   their merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69 F.3d at 348.

24   The conduct to be sanctioned must be due to willfulness, fault, or bad-faith, and due process

25   concerns require a relationship between the party's misconduct and the matters in controversy

26   /////

27

28   [5]  Obviously, under these circumstances, at the very least serious concerns regarding the veracity
     of the Laurino Plaintiffs' testimony on this subject  have been presented.

8

1    such that the "transgression threaten[s] to interfere with the rightful decision of the case." *Id.*

2    (citations and quotation marks omitted).

3         In support of their request for imposition of terminating sanctions, defendants argue that

4    the false testimony in question undermines the integrity of these proceedings because it interferes

5    with the determination of appropriate damages to be awarded by potentially inflating the Laurino

6    Plaintiff's damages and minimizing the Jurado Plaintiff's damages.  (Doc. No. 54-1 at 9.)  The

7    United States also contends it has been prejudiced by being "forced to expend significant

8    resources directed to determining the authenticity of the handwriting in the will." (*Id.* at 10.)  In

9    addition, now that the Laurino Plaintiffs have invoked their 5th Amendment rights in connection

10   with this issue, the United States cannot fully develop the record related to the validity of the will.

11   (*Id.*)  The United States concedes, however, that consideration of a number of the factors relevant

12   to the imposition of terminating sanctions weigh against the request, namely:  the public interest

13   favors disposition on the merits; lesser sanctions (including monetary sanctions and/or an adverse

14   inference determination) can cure some of the prejudice.  (*Id.* at 10–11.)  The government asserts

15   that the imposition of other sanctions will not address the fact that the Laurino Plaintiffs' overall

16   conduct "directly challenges the integrity of the judicial system."  (*Id.* at 11.)

17        Ultimately, given the court's conclusion set forth above that the validity of the will is not

18   central to the disposition of this case, the court cannot conclude that false testimony about the will

19   undermines the integrity of these proceedings.  This is because there is no direct relationship

20   between the party's alleged misconduct and the matters placed in controversy by this action such

21   that the "transgression threaten[s] to interfere with the rightful decision of the case." *Anheuser-*

22   *Busch*, 69 F.3d at 348.

23   **C.      Plaintiffs' Expert Disclosure**

24        In the context of mounting an opposition to the government's motion, the Laurino

25   Plaintiffs retained their own handwriting expert and (anticipating an objection) requested the

26   court's permission to present that expert's report, even though the expert was disclosed after the

27   relevant discovery deadline expired.  (Doc. No 55 at 5.)  Defendants have moved to strike that

28   expert report.  (Doc. No 58 at 12.)  Because the court has not relied on that expert report in this

1    order, it declines to rule on the request to allow late expert disclosure at this time.  The court

2    observes, however, that given the ongoing judicial emergency in this district and the length of

3    time that is likely to pass before this matter can be tried, any prejudice stemming from the late

4    disclosure may well be curable.

5                                          **CONCLUSION**

6          For the reasons explained above:

7          1.        Defendant motion requesting an adverse inference be drawn against the Laurino

8    Plaintiffs (Doc. No. 54) is denied;

9          2.        Defendant's motion for imposition of terminating sanctions against the Laurino

10   Plaintiffs (Doc. No. 54) is denied; and

11         3.        The Laurino Plaintiffs' request to present a handwriting expert disclosed after the

12   deadline for doing so under the scheduling order (Doc. No. 55) and defendants' motion to strike

13   that report (Doc. No. 58) are denied as moot in connection with resolution of the pending motion

14   and otherwise without prejudice to renewal.

15   IT IS SO ORDERED.

16       Dated:   **August 31, 2021**        _____

17                                            UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28

                                              10